IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

**UNITED STATES OF AMERICA**,

    *Plaintiff*,

*v.*

**AUBREY MAURICE JORDAN**,

    *Defendant*.

CAUSE NO. 3:18-CR-67-CWR-LGI-1

## ORDER

Before the Court are the Defendant's *motion in limine regarding eyewitness identification evidence*, the Government's response in opposition, and the Defendant's reply. *See* Docket Nos. 347, 357, and 359. On November 17, 2023 this Court held a hearing on this motion and heard arguments from counsel for the Government and Jordan.

Upon review, the motion will be denied.

**I.**  **Facts and Procedural History**

This case initially began as a drug conspiracy case involving only defendants Monroe Hughes and Cortez Byrd. It then took an unusual and deadly turn.

The story centers on Anton Ford, a confidential informant for the East Mississippi Drug Task Force. Ford, working with the U.S. Drug Enforcement Administration ("DEA"), purchased suspected MDMA/Ecstasy pills from Hughes and Byrd in September and October 2017. The Government tested these pills and found that they

contained methamphetamine. Hughes and Byrd were then indicted for several meth distribution charges.

Aubrey Maurice Jordan was not involved in those narcotics transactions or indictments. But the Government alleges that in 2018, while Byrd was detained on the drug charges, Byrd and Jordan spoke over the phone about identifying the confidential informant and orchestrating his murder. During one such a call in February 2018, Byrd was recorded asking Jordan to "think about anybody I was fucking with." Jordan responded, "Yeah Byrd. I can, I can do that . . . I'll still help you." In a call on March 10, 2018, Byrd advised a third party to stay home that evening because he "got something planned."

The night of March 10, 2018, Ford was sitting in his car outside of the Just Friends nightclub (also known as "JR's Lounge") in Meridian, Mississippi. Ford was shot from behind while in his car. He sustained a neck wound. Ford initially survived, but was left with serious injuries and spent weeks hospitalized at University of Mississippi Medical Center ("UMMC").

While at UMMC, Ford was interviewed by law enforcement on four occasions and presented with photo lineups of potential shooting suspects. Ford allegedly identified Jordan as his shooter in all of these interviews.

Ford's first interview occurred with Meridian Police Officers on March 24, 2018. Due to his injuries, he did not have the ability to speak or point that day. The Government contends that he nonetheless positively identified Jordan in a photo lineup by making head motions (not full nods) when presented with the image of Jordan.

Ford was then interviewed by DEA agents on April 9, 12, and 30, 2018. In those interviews, he had physically improved and could give traditional nods, mouth words, and, eventually, speak again. In each of those interviews, Ford continued to identify Jordan as the person who shot him.

Jordan contends that these interviews and photo lineups were impermissibly suggestive. He argues that the first "positive identification," which discerned Jordan's alleged involvement in the crime through non-verbal, "ambiguous" head movements, is not a reliable identification and should not be admitted into evidence. Jordan then says that the next three identifications were tainted, because Ford had by then been exposed to post-event information and simply continued to tell the story he had been exposed to by others.

Jordan is also concerned that the identifications are attributable to Ford's mother, Mae Ford. She was present at the hospital for the lineups with her son and law enforcement. Due to Ford's inability to speak during the first photo lineup, Ms. Ford inserted herself into the photo lineup procedure. At one point, after officers had trouble understanding him, Ms. Ford took the lineup sheet from the officer's hand and moved it closer to her son's face. She then proceeded to point to photos within the lineup and ask her son who shot him. At one point in the video recording of the lineup, Ms. Ford is seen pointing to a photo in the lineup asking, "this right here, that's him? This is who shot you?" She then said, "it's not him," as she pointed to other photos in the lineup.

Jordan believes that Ms. Ford's involvement and conduct during the photo lineup was improperly suggestive, rendering the identification unreliable. In addition to

3

inserting herself into law enforcement's identification process, prior to law enforcement's initial interview with Ford on March 24, Ms. Ford herself apparently attempted to find out the identity of the person who shot her son. She told law enforcement that while her son was in the hospital, unable to speak, she "got a piece of paper, began with the letter A and went through the alphabet" with her son, and her son would blink his eyes "yes" for the correct letter. Ms. Ford continued this process until the name "Aubrey" was spelled out. She did not know "Aubrey" but accessed a Facebook page with Aubrey Jordan's image or images.[1] She showed her son the picture(s) and claimed that her son positively identified Jordan as the shooter by blinking. This is, apparently, how law enforcement knew to include Jordan in the photo lineup in the first place.

In any event, Ford continued to identify Jordan as the shooter in the three April interviews that followed. He was able to speak in the last two interviews. Ford was finally discharged from the hospital in May 2018, now as a quadriplegic. He suffered a pulmonary embolism and passed away on May 27, 2018.

In this case, Jordan is charged with: killing a confidential informant to prevent his communication with law enforcement or judge of the United States, in violation of 18 U.S.C. § 1512(a)(1)(c); conspiracy to kill a confidential informant based on the

---

[1] It is not exactly clear whether Ms. Ford initially located Jordan's Facebook page following the alphabet identification process, or if he was initially identified through a photo on Cortez Byrd's Facebook page. Conflicting statements exist. A DEA report states that Ms. Ford first conducted the alphabet process with her son and found the name "Aubrey," then "went to Aubrey's Facebook page and found all of the suspects." Docket No. 357-6. In a recorded interview on March 24, 2018, though, she states that her son could speak better when medical staff "took the trachea out of his mouth and into his neck." She says he then verbally directed her to Facebook, "told us what name to go up under," said "scroll down," told her to stop, "pointed" to the picture, and said "that's him."

4

aforementioned charge, in violation of 18 U.S.C. § 1512(k); killing a confidential informant with intent to retaliate for providing law enforcement with incriminating information, in violation of 18 U.S.C. § 1513(a)(1)(b); and conspiracy to kill a confidential informant in retaliatory intent based on the aforementioned charge, in violation of 18 U.S.C. § 1513(f).

Jordan retained an expert witness, Dr. Margaret Bull Kovera, who calls into question the reliability of Ford's eyewitness identification. Dr. Kovera's expertise is in the psychology of eyewitness memory and the reliability (or lack thereof) of eyewitness identifications. She has submitted an expert report noting 12 areas where Ford's identification of Jordan is suspect.[2] Docket No. 347-1 at 3.

Jordan now seeks an Order excluding Ford's identifications.

## II. Legal Standard

> A motion in limine is a motion made prior to trial for the purpose of prohibiting opposing counsel from mentioning the existence of, alluding to, or offering evidence on matters so highly prejudicial to the moving party that a timely motion to strike or an instruction by the court to the jury to disregard the offending matter cannot overcome its prejudicial influence on the jurors' minds.

*O'Rear v. Fruehauf Corp.*, 554 F. 2d 1304, 1306 n.1 (5th Cir. 1977) (internal citations omitted). "Evidence should not be excluded in limine unless it is clearly inadmissible on all potential grounds." *Haddonfield Foods, Inc. v. S. Hens, Inc.*, No. 2:20-CV-84-KS-MTP, 2023 WL 2355902, at *1 (S.D. Miss. Mar. 3, 2023) (quotation marks and citation omitted).

---

[2] Dr. Kovera is also the subject of a motion by the Government to exclude her testimony as an expert witness. *See* Docket No. 389.

**III.     Discussion**

"Admissibility of identification evidence is governed by a two-step analysis enunciated in *Passman v. Blackburn*, 652 F.2d 559, 569 (5th Cir. 1981)." *United States v. Woolery*, 735 F.2d 818, 821 (5th Cir. 1984). The first step is to determine if the "identification procedure was impermissibly suggestive." *Id*. "If it is not, the inquiry ends." *Passman*, 652 F.2d at 569.

If the identification procedure was impermissibly suggestive, step two is "a separate inquiry" asking, under the totality of the circumstances, whether "the suggestiveness [led] to a substantial likelihood of irreparable misidentification." *Id*. This second step hinges on the reliability of the identification, and "an identification found to be reliable will be admitted even though the confrontation procedure was suggestive." *Id*.

In this Circuit there are six factors "to be considered in evaluating the risk of misidentification." *United States v. Atkins*, 698 F.2d 711, 713 (5th Cir. 1983). They are: "(1) the opportunity of the witness to view the criminal, (2) the witness' degree of attention, (3) the accuracy of the description, (4) the witness' level of certainty, (5) the elapsed time between the crime and the identification, and (6) the corrupting influence of the suggestive identification itself." *Id*.

A Due Process violation ultimately occurs, and the identification should be excluded, when the "identification procedure is 'unnecessarily suggestive and conducive to irreparable mistaken identification.'" *Id*. (citations omitted).

Here, the Court finds that Ford's identification of Jordan was impermissibly suggestive for all the reasons Jordan and his counsel have laid out, including the "numerous system errors present in the pre-lineup and lineup procedures, and the exposure of Ford to post-event information before he was ever presented with the initial photo lineup." Docket No. 347 at 6. This, however, does not end the analysis. We must then analyze the six *Atkins* factors to determine whether the identification caused a substantial likelihood of irreparable misidentification. The Court now turns to each of those factors.

### A.     The opportunity of the witness to view the criminal

The parties dispute whether Ford had an adequate opportunity to view the shooter before the crime. Their dispute touches on Ford's position in the vehicle, the vehicle's position in the parking lot, the amount of time he had, environmental factors, and the time of day. Each is addressed below.

Ford was shot through the window of the driver's side back door as he sat in his car.[3] The bullet entered through the back of his neck.

Jordan argues because of these facts, Ford must have been looking away from the shooter. Docket No. 347 at 17. At best, Ford could have only seen the shooter through the rearview or side mirrors. Jordan then contends that even if Ford did look in the direction of the shooter, the environmental factors, including the presence of a weapon, would have drawn his focus away from the shooter's face and toward the gun. *Id*. at 18. This

---

[3] Another way to put it is, if Ford was seated at 12 o'clock in the driver's seat, the bullet entered and hit him from 7 or 8 o'clock.

7

argument relies on Dr. Kovera's testimony and "weapon focus" theory. *See id.* Dr. Kovera also noted that Ford would have had only seconds to view the shooter. *Id.* Jordan argues that between the brief time, stress, the presence of the weapon, and the visibility (a parking lot at midnight), it is unlikely Ford actually saw the shooter.

Still, in each of his interviews, Ford told law enforcement that he heard someone with boots approaching the car, turned and looked, saw Jordan, and tried to duck right before being shot. The details changed slightly with each interview, but the gist of the narrative stayed the same. He heard someone approaching, turned to look, and saw Jordan with a gun before attempting to duck. The Government argues this means he had the ability to view the shooter—even if for only a few seconds.

It is uncontroverted that immediately before the shooting, Ford had moved his car from a dark area of the parking lot to right in front of the club. He explained that prior to the shooting, he was standing outside the club checking his phone when he noticed a red Impala pull into the lot with multiple men in the car. Ford decided to move his car to the front of the club right after this. It was while he sat in the driver's seat, parked in front of the club, that he was shot.

The responding officer's bodycam footage shows two outdoor "flood lights" attached to the club in front of Ford's car. The lighting from these flood lights may have been enough illumination to see the shooter approach, even if only for a second.[4]

---

[4] We do not have to devote much time to the Government's theory that additional lighting came from the headlights of other cars in the parking lot. *See* Docket No. 357 at 4-5. The Government references lights seen in Officer Fireplace's bodycam footage, but these lights are the headlights from responding vehicles or vehicles leaving the lot *after* the shooting.

The Court does not believe that Ford's opportunity to view the alleged perpetrator was so minimal as to tilt this factor toward inadmissibility. He said repeatedly that he heard someone coming towards him, saw the shooter approach from the rear, and then turned to look. Although brief, it was an opportunity to see his assailant. And a "witness' identification may be independent of an impermissibly suggestive technique even if his original observation was but a fleeting glimpse." *United States v. Gidley*, 527 F.2d 1345, 1351 (5th Cir. 1976). While the Court notices that with each interview the details change slightly, most details remain similar with each interview.

The Court is also not yet persuaded that "weapon focus" is an absolute truth—i.e., that every person when confronted with a gun looks immediately at the gun and not the shooter. The presence of a weapon may not affect every person the same way, especially if the victim was already familiar with a shooter and quickly recognizes them. Here, the record indicates that Ford and Jordan knew each other.

For these reasons, this factor favors admissibility.

### B. The witness' degree of attention

On the next factor, Jordan argues that Ford didn't identify him as the shooter until he was targeted by Ms. Ford's own Facebook investigation. "All the details concerning Ford's purported Facebook identification of Mr. Jordan came from Ford's mother." This, and the post-shooting information Ford was exposed to by his mother, his girlfriend, or anyone else, Jordan says, is what made him a suspect. Nothing else.

9

Jordan relies on the fact that Ford's story changed slightly with each interview, and that Ford did not provide many details unique to Jordan regarding what he was wearing or what he looked like.

While this information is important to consider, this is not how this Court understands or appreciates the "degree of attention" factor. Case law instead suggests that "degree of attention" is about how much attention or concentration someone pays to an event. In *United States v. Gonzalez-Fuentes*, for example, the Fifth Circuit noted the following:

> Allen's degree of attention was great. He was positioned along the side of the road specifically to observe the traffic passing him. A law-enforcement officer with seven years of experience at the time, Allen was trained in the techniques of observation and identification. We have, in the past, accorded greater weight to witnesses with law enforcement training than to lay people observing similar activity.

26 F.3d 1117 (5th Cir. 1994).

Ford's background working security at the club factors into his degree of attention. While not a sworn law enforcement officer like the witness in *Gonzalez-Fuentes*, Ford explained to DEA agents, in the April 30, 2018 interview that he had frequented JR's Lounge for over a year and sometimes worked there doing security. *See* Docket No. 347-14 at 3:00-3:30. While working security, he was outside, in the same parking area doing crowd control and making "checks." This means that he was accustomed to paying attention to individuals in the parking lot. It was while doing his "checks," in fact, that Ford noticed the red Impala pull into the parking lot. *Id* at 7:30-8:01.

10

Other factors also make it plausible that Ford would have displayed a higher degree of attention that evening. He was recently made aware that he had been outed as an informant in a criminal investigation. When he observed a noteworthy car pull into the parking lot, he decided to move his car to a better-lit spot. These facts indicate he may have had a heightened degree of attention, especially if he was suspicious or nervous upon seeing the red Impala enter the lot.

This factor favors admissibility.

### C. The accuracy of the description

Precedent suggests that this next factor, while entitled "accuracy," is actually about the level of detail the witness remembers. In *Manson v. Brathwaite*, the Supreme Court analyzed this factor and noted the witness' description "included the [defendant's] race, his height, his build, the color and style of his hair, and the high cheekbone facial feature. It also included clothing the [defendant] wore." 432 U.S. 98, 115 (1977). The Court will adhere to this usage.

Jordan emphasizes that Ford's identification didn't provide many physical details about Jordan or his appearance. Jordan argues that "absent Ford's mother's Facebook show-up and her insistence on Mr. Ford identifying Mr. Jordan during the March 24 interview, there is no evidence in the record that would have led to Mr. Jordan being identified as a suspect in the first place." Docket No. 347 at 20.

The point is well-taken. Ford did not indicate any unique identifiers of the shooter. He provided no information about what the shooter was wearing, described no significant physical features and did not explain exactly how he knew it was Jordan. The

11

fact that Ford didn't describe anything about the shooter, other than hearing boots and identifying Jordan, is not particularly helpful.

Ford did, however, give a rough estimation of the size of the shooter. He told DEA investigator Wilburn that the shooter was "about your size but short." Jordan is 5 feet, 5 inches tall. Ford also claimed that the shooter was "Birdman's best friend." Cortez Byrd's nickname is "Birdman."

The Government argues that Ford's identification was accurate as he identified Jordan at least four times. In one of those times, Ford claimed that he will "never forget [Jordan's] face."

The lack of detail in Ford's identification, however, calls into question the accuracy of his description. The Court is not convinced that a description is necessarily accurate because it is repeated multiple times, especially when the witness is exposed to so much post-event information and makes an initial identification via blinking at Facebook photos.

The most descriptive piece of information that Ford provided about the shooter is that he was "short." But this came in the April 9 interview, well after Ford's mother narrowed the focus to Jordan through Facebook. And because Ford knew Jordan from the community, he had previous knowledge that Jordan was an associate of "Birdman" and that he is not very tall. Those details were commonly known and, moreover, could be ascertained from viewing pictures on Facebook.

This factor favors inadmissibility.

### D. The witness' level of certainty

Jordan next argues that Ford's "level of certainty of his identification is nonexistent." Docket No. 347 at 21. The crux of this argument is that any certainty came from improper suggestions by his mother and Meridian police at the March 24 lineup.

The record suggests that Ms. Ford took over the photo lineup and Detective Evans improperly suggested "the one in the white shirt." Then Ms. Ford began asking her son questions like, "it's not him, is it?" This question, made as she pointed to other photos, implied that Ford should say "no." The police then circled the photo of Jordan to have Ford confirm, and Detective Evans asked if the shooter was the one who was circled.

Jordan relies on Dr. Kovera's testimony to explain how improper influence by the police and his mother inflate Ford's level of certainty. *See* Docket No. 347 at 21-23. Jordan claims this is why in later interviews Ford gave more detail as he continued to "repeat" information he was told by others. Jordan argues that "the repeated identifications likely worked to strengthen his resolve that he had chosen the correct person initially." *Id.* at 23.

The Government responds that Ford properly identified Jordan as the shooter at each interview and photo lineup, thus confirming his certainty. In one of them, Ford remarked to police that he "would never forget [Jordan's] face."

The Government directs us to *Allen v. Estelle*, 568 F.2d 1108, 111[4] (5th Cir. 1978), where similar to this case, the victim "provided even more relevant information regarding the color and make of the car in which his assailants fled." That victim "expressed a high level of certainty as to his identification . . . , testifying that he 'wouldn't

13

forget either (suspect) in a hundred years.'" *Id*. The Fifth Circuit found this assurance to mean that the witness was certain.

As the Court said earlier, the March 24 interview does seem impermissibly suggestive. Police should not have allowed Ms. Ford to play such an integral role in the lineup, and Detective Evans' process and questioning were far from perfect. Ford nevertheless continued to identify Jordan at each interview. From April 9 onward, Ford verbally stated that Jordan shot him. It is hard on this record to say Ford's certainty was due to the earlier conduct of the Meridian police and his mother. We do not know what Ford thought or how he thought—we only know what he repeatedly stated.

While the process was flawed, the Court does know that the lineups from the Meridian police and the lineups from the DEA differed. Jordan was in a different color shirt and in a different position in those respective lineups. The DEA lineup did not have Jordan circled, for example, and Ford still selected Jordan as the shooter. Ford identified Jordan each time when interviewed, indicating some level of certainty.

This factor favors admissibility.

### E. The time elapsed between the crime and the identification

Ford was shot on March 10, 2018. The next day, he was medically sedated and intubated. His first interview with police was two weeks after the shooting. His ability to speak was limited until sometime in April.

Generally, as time passes a person's recollection of an event gets worse. Jordan relies on Dr. Kovera's testimony that "the most precipitous memory loss occurs within the first 12 hours." Docket No. 359 at 11. Jordan therefore argues that the two weeks that

14

elapsed between the crime and the first identification are significant. Ford would not be able to recall the shooter, he maintains, absent suggestive prompting by his mother and the police.

Jordan notes that Ford did not identify Jordan to the responding officer, even though he could speak initially. Nor did Ford tell medical staff who shot him when he was first hospitalized and could still speak. The medical records confirm that Ford could speak upon arrival to the hospital in Meridian. The record from Anderson Regional Medical Clinic indicates, for example, that Ford "states that he started to feel as if he cannot breathe . . . States that he can feel people touching him but cannot move his extremities."

At the motion hearing, the Government argued that during the time that Ford was medically sedated, time essentially stopped for him. It claims that the two-week period between the shooting and interview with police is not a significant period of time. Because "time stopped" and Ford was free from exposure to environmental factors or post-event information while sedated, it was just as if he was in a coma.

For that matter, the Government also disputes that Ford was out for two full weeks. The record shows that Ford was intubated and transferred to UMMC on March 11. On March 19, Ford's mother informed police that he would be able to talk within a few days, as the tube was being removed. The Government contends that the eight days of intubation do not count, and that Ford's memory should only be charged with a six-day distance between shooting and identification.

The Government points to three cases where the Fifth Circuit or the Supreme Court found identifications reliable up to seven months after the crime. *See United States v. Sanchez*, 988 F.2d 1384, 1390 (5th Cir. 1993) (finding an identification reliable that occurred "only one and one-half weeks after the crime"); *McFadden v. Cabana*, 851 F.2d 784, 790 (5th Cir. 1988) (finding the identification reliable when "the lineup occurred only a few weeks after"); *Neil v. Biggers*, 409 U.S. 188, 201 (1972) (finding that the "lapse of seven months between the rape and the confrontation" did not make the identification unreliable).

Jordan responds that the facts of these identifications differ so much that these cases are not instructive. The witness in *Sanchez*, for example, had seen the suspect in the neighborhood prior to the crime and twice on the day in question. That crime occurred outdoors "in the morning light" with the witness only a few feet away from the accused. *Biggers* was a sexual assault where the victim was forced to spend up to half an hour with the assailant and saw his face directly. She also refused to identify other suspects for seven months because she did not believe they were her attacker. *Biggers*, 409 U.S. at 194-95. The Supreme Court found "[h]er record for reliability . . . a good one, as she had previously resisted whatever suggestiveness inheres in a showup." *Id.* at 201.

While the Court appreciates that the facts in the Government's cases differ from this case, particularly in *Biggers*, this Circuit's precedent leans towards admissibility. In *McFadden v. Cabana*, the Fifth Circuit found that an identification that occurred a "few weeks after" the crime did not make it unreliable. 851 F.2d at 790. There is not a hard cutoff where, after a certain number of hours or days, an identification becomes

16

unreliable. And here, just like the witness in *Sanchez*, Ford had seen Jordan before the shooting. He knew him from the community and knew who Jordan's friends were. He was not a stranger. If we accept that time essentially stopped for Ford due to medical sedation, the time period is even smaller.

This factor favors admissibility.

### F. The corrupting influence of the suggestive identification itself

Lastly, Jordan argues that absent law enforcement's improper and suggestive procedures during the first photo lineup on March 24, it is "unlikely that Ford would have ever identified Mr. Jordan as his shooter." Docket No. 347 at 24. Jordan claims that the corrupting effect of the impermissibly-suggestive identification caused the false identification of Jordan. The Government responds that "law enforcement did nothing to suggest the selection of the photograph of Defendant Jordan." Docket No. 357 at 10. This is an attempt to pin the blame for suggestive conduct on Mae Ford rather than law enforcement.

The Court does not believe that law enforcement "did nothing" to contribute to the impermissibly suggestive identification. Law enforcement did not use proper "fillers" of non-suspects.[5] *See* Docket No. 347-1 at 9-10. The officers did not inform Ford that the suspect may not be in the lineup. And most importantly, the police did not control the interview on March 24. The officers should never have allowed the victim's mother, an untrained civilian, to take control of the lineup procedure.

---

[5] During the April 12 lineup, in fact, the characteristics of the "fillers" in the lineup did not match the characteristics of the suspect. DEA agents showed Ford a lineup of all white men, even though he had already identified Jordan twice. *See* Docket No. 347-11.

17

Yet, acknowledging that what happened at the March 24 lineup was improper, *Perry v. New Hampshire*, 565 U.S. 228, 248 (2012) makes clear that the Due Process Clause is implicated only when the improper conduct is arranged by law enforcement. "[W]e hold that the Due Process Clause does not require a preliminary judicial inquiry into the reliability of an eyewitness identification when the identification was not procured under unnecessarily suggestive circumstances arranged by law enforcement." *Id*. And here, the most important identification was not conducted by law enforcement.

Jordan and his expert, Dr. Kovera, say it is likely Ford identified Jordan from "what Ford saw on Facebook from his mother as opposed to what he actually remembered from the night of the incident." Docket No. 347 at 24. Thus, the defense seems to acknowledge that the most corrupting influence was not from law enforcement.

In *United States v. Sharpe*, 193 F.3d 852, 868 (5th Cir. 1999) the Fifth Circuit found an identification to be reliable after the witness' mother gave him a newspaper article containing a photograph of the defendant. The witness then told the government that the photograph in the newspaper was the same person he saw the night of the crime. *Id*. The Fifth Circuit said that unlike cases which "involve the issue of a photographic line up prepared by police," the witness' "encounter with [the defendant's] photograph was unplanned and unexpected, and thus did not give rise to a due process challenge." *Id*.

This Court does not and cannot know why Ford identified Jordan as the shooter. Maybe Ford did, in fact, catch a glimpse of Jordan about to pull the trigger. Or maybe Ford was led astray by a Facebook lineup conducted by his mother and remained anchored to that belief in the interviews that followed. Given *Sharpe*, however, the conflict

does not support exclusion. The Facebook identification does not implicate police lineup procedure; it happened regardless of law enforcement's conduct. The influence of law enforcement's errant identification procedures do not appear so corrupting as to render the identification unreliable and at risk for misidentification.

This factor favors admissibility.

### G.     Section Conclusion

"[I]f the indicia of reliability are strong enough to outweigh the corrupting effect of the police-arranged suggestive circumstances, the identification evidence ordinarily will be admitted, and the jury will ultimately determine its worth." *Perry*, 565 U.S. at 232. That is what will happen here.

Courts must analyze the *Atkins* factors under the totality of the circumstances. And here, the totality of the circumstances supports including the eyewitness identification. Although Ford's identification was not very particular, and the most accurate description given was that Jordan was "short," he consistently identified Jordan as the shooter. Without significant corrupting influence by law enforcement. Ford had enough of an opportunity to view the shooter underneath the club's flood lights. He had a heightened degree of attention that evening while in the parking lot. He repeatedly assured law enforcement of his certainty that it was Jordan. And a significant amount of time did not lapse between the crime and his identification.

For these reasons, Ford's eyewitness identification of Jordan is sufficiently reliable. The jury will decide what weight to give this identification. We can expect robust testimony from a number of witnesses about all aspects of the identification. That battle

19

will be waged before the jury. The jurors will also see the video recordings of the interviews and lineups, and learn of everything else that went into making this identification—for better or for worse.

### IV.     Conclusion

The *motion in limine regarding eyewitness identification evidence* is denied.

**SO ORDERED**, this the 11th day of December, 2023.

s/ Carlton W. Reeves  
UNITED STATES DISTRICT JUDGE
