IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA**, *Plaintiff*, v. **AUBREY MAURICE JORDAN**, *Defendant*. | CAUSE NO. 3:18-CR-67-CWR-LGI-1 |

### ORDER

Before the Court are the Government's *Motion to Exclude Testimony of Margaret Bull Kovera* and the Defendant's response in opposition. Docket Nos. 389 and 404. A hearing on this motion was held on November 17, 2023. Upon review, the motion will be denied.

**I.     Facts and Procedural History**

As this Court has recapped in prior orders, this matter began as a drug conspiracy case involving only defendants Monroe Hughes and Cortez Byrd. It then took an unusual and deadly turn.

The story centers on Anton Ford, a confidential informant working with local and federal authorities. Ford allegedly purchased methamphetamine from Hughes and Byrd in fall 2017. Hughes and Byrd were then indicted for several meth distribution charges.

Aubrey Maurice Jordan was not involved in those transactions or indictments. But the Government alleges that in 2018, while Byrd was detained on the drug charges, Byrd

and Jordan spoke over the phone about identifying the confidential informant and orchestrating his murder. During one call in February 2018, Byrd was recorded asking Jordan to "think about anybody I was fucking with." Jordan responded, "Yeah Byrd. I can, I can do that . . . I'll still help you." In another call on March 10, 2018, Byrd advised a third party to stay home that evening because he "got something planned."

The night of March 10, 2018, Ford was sitting in his car outside a nightclub in Meridian, Mississippi. Ford was shot from behind while in his car. He sustained a neck wound. Ford initially survived, but was left with serious injuries and spent weeks hospitalized at University of Mississippi Medical Center ("UMMC").

While at UMMC, Ford was interviewed by law enforcement on four occasions and presented with photo lineups of potential shooting suspects. Ford allegedly identified Jordan as his shooter in all of these interviews.

Ford's first interview occurred with Meridian Police Officers on March 24, 2018. Due to his injuries, he did not have the ability to speak or point that day. The Government contends that he nonetheless positively identified Jordan in a photo lineup by making head motions (not full nods) when presented with the image of Jordan.

Ford was then interviewed by DEA agents on April 9, 12, and 30, 2018. In those interviews, he had physically improved and could give traditional nods, mouth words, and, eventually, speak again. In each of those interviews, Ford continued to identify Jordan as the person who shot him.

Jordan contends that these interviews and photo lineups were impermissibly suggestive. He argues that the first "positive identification," which discerned Jordan's

alleged involvement in the crime through non-verbal, "ambiguous" head movements, is unreliable and should not be admitted into evidence. Jordan then says that the next three identifications were tainted, because Ford had by then been exposed to post-event information and simply continued to tell the story he had been exposed to by others.

Jordan is also concerned that the identifications are attributable to Ford's mother, Mae Ford, who was present at the hospital for the lineups. Due to Ford's inability to speak during the first photo lineup, Ms. Ford inserted herself into the photo lineup procedure. At one point, after officers had trouble understanding him, Ms. Ford took the lineup sheet from the officer and moved it closer to her son's face. She proceeded to point to photos within the lineup and ask her son who shot him. At one point in the video recording of the lineup, Ms. Ford is seen pointing to a photo in the lineup asking, "this right here, that's him? This is who shot you?" She then said, "it's not him," as she pointed to other photos in the lineup.

In addition to inserting herself into law enforcement's identification process, prior to law enforcement's initial interview with Ford on March 24, Ms. Ford herself apparently attempted to find out the identity of the shooter. She told officers that while her son was in the hospital, unable to speak, she "got a piece of paper, began with the letter A and went through the alphabet" with her son, and her son would blink his eyes "yes" for the correct letter. Ms. Ford continued this process until the name "Aubrey" was spelled out. She did not know "Aubrey" but accessed a Facebook page with Aubrey Jordan's image

or images.[1] She showed her son the picture(s) and claimed that her son positively identified Jordan as the shooter by blinking. This is, apparently, how law enforcement knew to include Jordan in the photo lineup in the first place.

In any event, Ford continued to identify Jordan as the shooter in the three April interviews that followed. He was able to speak in the last two interviews. Ford was finally discharged from the hospital in May 2018, now as a quadriplegic. He suffered a pulmonary embolism and passed away later that month.

In this case, Jordan is charged with: killing a confidential informant to prevent his communication with law enforcement or judge of the United States, in violation of 18 U.S.C. § 1512(a)(1)(c); conspiracy to kill a confidential informant in violation of 18 U.S.C. § 1512(k); killing a confidential informant with intent to retaliate for providing law enforcement with incriminating information, in violation of 18 U.S.C. § 1513(a)(1)(b); and conspiracy to kill a confidential informant in retaliatory intent in violation of 18 U.S.C. § 1513(f).

Jordan has retained an expert witness, Dr. Margaret Bull Kovera, to call into question the reliability of Ford's identifications. Dr. Kovera's expertise is in the

---

[1] It is not exactly clear whether Ms. Ford initially located Jordan's Facebook page following the alphabet identification process, or if he was initially identified through a photo on Cortez Byrd's Facebook page. Conflicting statements exist. A DEA report states that Ms. Ford first conducted the alphabet process with her son and found the name "Aubrey," then "went to Aubrey's Facebook page and found all of the suspects." Docket No. 357-6. In a recorded interview on March 24, 2018, though, she states that her son could speak better when medical staff "took the trachea out of his mouth and into his neck." She says he then verbally directed her to Facebook, "told us what name to go up under," said "scroll down," told her to stop, "pointed" to the picture, and said "that's him."

psychology of eyewitness memory and the reliability (or lack thereof) of eyewitness identifications.

Dr. Kovera's report was first produced in January 2022 as an exhibit to Jordan's motion for bond. *See* Docket No. 271-1. She was formally designated as an expert in March 2023. Docket No. 330. In her report, Dr. Kovera identified 12 issues where she says Ford's identification of Jordan is suspect. Docket No. 271-1 at 3. She finds "substantial evidence that there were factors present in this case that would have adversely affected the witness's ability to make a correct identification." *Id*. at 13.

The Government has not designated its own expert to testify to the reliability of the identification. Instead, it now moves to exclude Dr. Kovera's testimony.

The Government paints Dr. Kovera's testimony and report as "her psychological theory" as to Ford's "perception and memory." Docket No. 389 at 2. At the hearing, the Government argued that Dr. Kovera's report is "on its face" deficient, claiming that she would be made to look like a "super juror." It argued that Dr. Kovera has a "lack of a basis for her opinion," lacks an adequate methodology, and "her testimony would be misleading at worst and unhelpful at best to the jury." *Id*. at 8.

In response, Jordan argues that "[t]he government has failed to identify a single specific basis to support its argument that Dr. Kovera's testimony is unreliable." Docket No. 404 at 3.

5

## II.     Legal Standard

The admissibility of expert testimony is governed by *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and Federal Rule of Evidence 702. *See Guy v. Crown Equip. Corp.*, 394 F. 3d 320, 325 (5th Cir. 2004).

Rule 702 was recently amended; the new Amendment took effect December 1, 2023. It now states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
>
> **(a)** the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> **(b)** the testimony is based on sufficient facts or data;
>
> **(c)** the testimony is the product of reliable principles and methods; and
>
> **(d)** the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Fed. R. Evid. 702.[2]

The new rule does not change the existing law. *See Sardis v. Overhead Door Corp.*, 10 F.4th 268, 284 (4th Cir. 2021) (explaining that the advisory committee's notes to the

---

[2] Prior to the 2023 Amendment, Rule 702 read: "A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
**(a)** the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
**(b)** the testimony is based on sufficient facts or data;
**(c)** the testimony is the product of reliable principles and methods; and
**(d)** the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702 (2011)(amended 2023).

new rule echo and are consistent with the existing law). The purpose of Rule 702 is to guide the District Court's gatekeeping function. *See Guy*, 394 F.3d at 325. Before allowing a witness to testify as an expert, the Court "must be assured that the proffered witness is qualified to testify by virtue of his 'knowledge, skill, experience, training, or education.'" *Wilson v. Woods,* 163 F.3d 935, 937 (5th Cir. 1999) (quoting Fed. R. Evid. 702).

The Court's gatekeeping function also involves ensuring that "the expert uses reliable methods to reach his opinions," and that those opinions are "relevant to the facts of the case." *Guy,* 394 F.3d at 325. "Reliability is determined by assessing whether the reasoning or methodology underlying the testimony is scientifically valid. Relevance depends upon whether that reasoning or methodology properly can be applied to the facts in issue." *Knight v. Kirby Inland Marine Inc.,* 482 F.3d 347, 352 (5th Cir. 2007) (quotation marks, citations, and brackets omitted); *see United States v. Fields,* 483 F.3d 313, 342 (5th Cir. 2007).

In *Daubert,* the Supreme Court described several non-exclusive factors that trial judges should consider in gauging reliability, including (1) whether the proposed technique or theory can be or has been tested, (2) whether it has been subjected to peer review and publication, (3) whether its error rate is acceptable, (4) whether the theory is generally accepted in the scientific community, and (5) whether there are standards controlling the technique. *See Guy,* 394 F.3d at 325; *Knight,* 482 F.3d at 351. The Fifth Circuit later instructed that "the reliability analysis must remain flexible: not every *Daubert* factor will be applicable in every situation; and a court has discretion to consider other factors it deems relevant." *Guy,* 394 F.3d at 325 (citation omitted); *see Hathaway v.*

7

*Bazany,* 507 F.3d 312, 318 (5th Cir.2007). The party offering the expert bears the burden of establishing expert reliability by a preponderance of the evidence. *Moore v. Ashland Chem. Inc.,* 151 F.3d 269, 276 (5th Cir. 1998) (en banc).

The *Daubert* analysis applies to the process by which an expert reaches their conclusions, not to the merits of the conclusions themselves. *Guy,* 394 F.3d at 325. "Proponents do not have to demonstrate to the judge by a preponderance of the evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of the evidence that their opinions are reliable." Fed. R. Evid. 702 advisory committee's note to 2023 amendment (cleaned up).

> Some challenges to expert testimony will raise matters of weight rather than admissibility . . . . For example, if the Court finds it more likely than not that an expert has a sufficient basis to support an opinion, the fact that the expert has not read every single study that exists will raise a question of weight and not admissibility . . . . [O]nce the Court has found it more likely than not that the admissibility requirement has been met, any attack by the opponent will go only to the weight of the evidence.

*Id.*

The merits of the expert's conclusions remain subject to attack at trial under traditional principles of "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Daubert,* 509 U.S. at 596. "[I]n determining the admissibility of expert testimony, the district court should approach its task with proper deference to the jury's role as the arbiter of disputes between conflicting opinions." *United States v. 14.38 Acres of Land, More or Less Situated in Leflore Cnty., State of Miss.,* 80 F.3d 1074, 1077 (5th Cir. 1996) (quotation marks and citation omitted).

8

### III. Discussion

Much of the Government's argument is a restatement of the legal standard, emphasizing the Court's gatekeeping role. Docket No. 389 at 4. Then it says a hearing should be had when dealing with such complex issues. *Id*. at 7. Although a hearing is not mandatory, the Court granted the government's request and held a hearing. The main argument this Court can discern from the remainder of the motion is reliance on the Fifth Circuit's decision in *United States v. Moore*, 786 F.2d 1308 (5th Cir. 1986), in an attempt to paint Dr. Kovera's report and testimony as a "psychological theory" rather than an application of established science. *Id.* at 2.

#### A. *United States v. Moore*

In *Moore*, the Fifth Circuit affirmed the exclusion of an expert witness who would have testified about "psychological theories relating to eyewitness identification." 786 F.2d at 1311. The appellate court explained that "any problems with perception and memory are easily understood by jurors and can be adequately addressed through cross-examination." *Id.* at 1312. Thus, the Government argues that Dr. Kovera's testimony is not needed.

However, *Moore* is not helpful to the Government here. As the next page in *Moore* states, "[i]n some cases casual eyewitness testimony may make the entire difference between a finding of guilt or innocence. In such a case expert eyewitness identification testimony may be critical." *Id*. at 1313. An expert was not critical in *Moore* because "the other evidence of guilt is overwhelming." *Id.* But the Fifth Circuit took pains to "emphasize that in a case in which the sole testimony is casual eyewitness identification,

9

expert testimony regarding the accuracy of that identification is admissible and properly may be encouraged." *Id*.

Ours is a case where expert testimony is "critical" and should be "encouraged." The Government's evidence connecting Mr. Jordan to the crime is the eyewitness identification by Ford and a recorded phone call.[3] The Government has pointed to no physical evidence connecting Jordan to Ford's murder. Zero physical evidence, and there are no admissions by co-defendants. This is the type of situation the Fifth Circuit anticipated in *Moore*, where eyewitness testimony can "make the entire difference between a finding of guilt or innocence." *Id*.

This Court is also mindful that one year after *Moore*, the Fifth Circuit decided *United States v. Alexander*, 816 F.2d 164 (5th Cir. 1987). In *Alexander*, the court reversed a decision excluding two experts who would have challenged eyewitness identifications. 816 F.2d at 170. The Fifth Circuit reasoned that "[t]he entire case against [the defendant] turned on the photographic identification, and it was clearly erroneous for the district court to exclude without good reason relevant expert testimony bearing directly on that issue." *Id*. at 169. The same is true today.

The Court will move on to examine whether Dr. Kovera's anticipated testimony satisfies Rule 702 and its interpretative cases.

---

[3] This recorded phone call is neither a clear nor perfect indication of guilt. The defendants may have been speaking around the topic, but they did not clearly articulate their plan or role in Ford's murder. The matter requires inferences of a fact-finder.

**B.     Dr. Kovera's Expert Testimony**

At the hearing, the Government argued that Dr. Kovera did not meet any of the Rule 702 factors. The Court disagrees.

Dr. Kovera holds a Ph.D. in Social Psychology and is a Presidential Scholar and Professor of Psychology at John Jay College of the City University of New York. Docket No. 347-1. Over her 30-year career, she has published several books and over 80 papers on eyewitness identification, decision making and eyewitness memory. *Id.; see also* Docket No. 347-3, at 69-70 and 73. She is a fellow and past president of the American Psychology-Law Society, an interdisciplinary organization of psychologists and lawyers "devoted to scholarship, practice, and public service in psychology and law." *Id*. She was the Editor-in-Chief of *Law and Human Behavior*, a peer-reviewed publication, for seven years. Since 2006, Dr. Kovera has served as an expert witness in more than a dozen state and federal criminal cases. *See* Docket No. 271-3; *see also* Docket No. 347-1 at 2.  She has been labeled as one of the "[l]eading social science researchers . . . . [who has] provided extensive scholarship contesting the reliability of eyewitness identification." Daniel Manley, *Reforming Eyewitness Identification Processes: Challenges and Recommendations for Successful Implementation*, 44 Mitchell Hamline L. J. of Pub. Pol'y & Prac.  40 (2023)(citing Margaret Bull Kovera & Andrew J. Evelo, *Improving Eyewitness-Identification Evidence Through Double-Blind Lineup Administration*, 29 Current Directions Psych. Sci. 563, 563-567 (2020)).

Given the above, the Court finds Dr. Kovera qualified to speak on the matters within the scope of her report and designation.

The Government then argues that Dr. Kovera's testimony will not help the trier of fact understand the evidence or to determine a fact in issue, because the issues are within the capabilities of the average juror. Once again, *Moore* is instructive here. If this case had more evidence of the guilt of Mr. Jordan aside from the eyewitness identification, then maybe the Government could successfully argue that an expert's testimony would be needlessly cumulative. But given the nature of this shooting and the eyewitness identification process utilized, Dr. Kovera's testimony will more likely than not help the jury understand and determine the reliability of Ford's identification.

The notion that Dr. Kovera's testimony is not based on sufficient facts, meanwhile, is unsupported by the record. To prepare her report Dr. Kovera reviewed "police reports, body camera video, video interviews with the witness and the witness's mother, and documentation of the photo arrays." Docket No. 347-1 at 2. All these materials are relevant. Mr. Jordan has met his burden to demonstrate that Dr. Kovera's testimony is based on sufficient facts.

The Government then argues that Dr. Kovera's report was not the product of reliable principles and methods. It takes issue with conclusory statements in Dr. Kovera's report and, at the hearing, expressed doubt that she properly relied on scientific methods. The Government argues that the issues Dr. Kovera identifies "cannot be reproduced in a lab." It says the idea of "weapon focus" and the effect of stress on eyewitness identification are unreliable because "you can't point a gun at somebody in a lab." The Government's argument borders on saying psychology is not a science.

None of these arguments are compelling. First, as Dr. Kovera explains,

12

> [v]irtually all of the empirical eyewitness research conducted by psychologists makes use of standard experimental methods employed in all the experimental sciences. Use of appropriate research methods is an essential requirement for publication in peer-reviewed scientific journals across all scientific disciplines and psychology is no exception.

Docket No. 347-1 at 5. Psychology is a science. It is a "diverse scientific discipline comprising several major branches of research," including experimental, biological, cognitive, human factors, and the research involves observation, experimentation, testing and analysis, among other things. *Psychology*, APA Dictionary of Psychology, https://dictionary.apa.org/psychology (last visited Dec. 15, 2023).

Dr. Kovera's report both provides general summaries about issues with eyewitness identifications and explains the underlying experimental psychology. For example, when explaining how stress impacts eyewitness identifications, she explains that "[t]hese effects are confirmed and extended in a study by Morgan et al. (2004) who examined the eyewitness capabilities of more than 500 active-duty military personnel enrolled in a survival school program." *Id*. at 6. Participants in that study were exposed to both "a high stress interrogation with real physical confrontation and a low-stress interrogation without physical confrontation." *Id*. She then explains the results: "participants were tested on their ability to recognize the interrogators-recognition accuracy for the low-stress interrogators was as high as 76% but for high-stress interrogators it was as low as 27%." *Id*. This study, along with the other studies Dr. Kovera relies upon, were conducted by professional experiential psychologists, then evaluated by and published in a peer-reviewed scientific journal.

Dr. Kovera's report also cites to published and peer-reviewed studies that she herself conducted. For example, "Greathouse and Kovera (2009) manipulated whether an administrator had knowledge of the suspect's identity, the type of lineup (simultaneous vs. sequential), the presence of the actual perpetrator in the lineup and the type of lineup instructions (biased vs. unbiased)." *Id*. at 10. This means that she, in fact, conducted experiments herself. While she did not "point a gun at somebody in a lab" these studies too were successfully peer-reviewed and published in legitimate scientific journals. Some of the journals she relies on include *Journal of Experimental Psychology: Applied*; *Psychology, Crime & Law*; *Journal of Applied Research in Memory and Cognition*; and *Forensic Psychology*. No evidence has been offered to show that any of these publications or studies are illegitimate.

There is nothing within the briefs, or raised at the hearing, that allows this Court to call into question this experimental psychology. In fact, this type of experimental psychology may be a particularly useful tool within the criminal legal process. As Dan Simon explained:

> One of the obvious features of the criminal justice process is that it is operationalized mostly through people: witnesses, detectives, suspects, lawyers, judges, and jurors. The wheels of the system are turned by the mental operations of these actors: memories, recognitions, assessments, inferences, social influence, and decisions, all tied in with moral judgments, emotions, and motivations. Criminal verdicts can be no better than the combined result of the mental operations of the people involved in the process. It thus seems sensible to examine the workings of the criminal justice process from a psychological perspective. Fortunately, a large body of experimental psychological research is at our disposal.

Dan Simon, *In Doubt: The Psychology of the Criminal Justice Process*, 3 (2012). It is this body of experimental psychological research that Dr. Kovera relies upon.

For these reasons, it is more likely than not that Kovera's testimony is the product of reliable principles and methods.

Lastly, the Government argues that Dr. Kovera's report was not a reliable application of her discipline to the facts of this case. This part of its argument even claimed that "Dr. Kovera merely printed out articles and read them."

The Court disagrees.

Dr. Kovera's report thoroughly applies the research to the facts of the case. For example, when explaining issues with "Exposure Duration," Dr. Kovera presents the facts Ford told investigators: "Ford reported that he heard someone with boots walking toward the back of his car, he looked back, saw the shooter, and then ducked (Video interview on 4/12/18, 4:44)." Docket No. 347-1 at 7. She then explains a different account Ford gave investigators and how it fits with the experimental psychology: "Irrespective of which account is more likely to be accurate, Ford had limited time to see the shooter. The time available for viewing a perpetrator is positively associated with the witness's ability to subsequently identify him. Shapiro and Penrod's (1986) meta-analysis of more than 100 experiments showed that exposure time was a reliable predictor of accuracy." *Id*.

On this record, therefore, the Court sees no unreliable application of psychology to the facts at hand.

For these reasons, the proffered testimony of Dr. Kovera meets the admissibility requirements set forth in Rule 702 and its interpretative case law. Her expert testimony shall be admitted at trial.

**IV.   Conclusion**

The Government's *Motion to Exclude Testimony of Margaret Bull Kovera* is denied.

**SO ORDERED**, this the 15th day of December, 2023.

s/ Carlton W. Reeves<br>
UNITED STATES DISTRICT JUDGE